Bridge Co. *v.* Hoboken Land and Improvement Co.

THE PROPRIETORS OF THE BRIDGES OVER THE RIVERS PAS-
SAIC AND HACKENSACK *vs.* THE HOBOKEN LAND AND IM-
PROVEMENT COMPANY.

The clause in the charter of the Proprietors of the Bridges over the rivers
Passaic and Hackensack, which declares that it shall not be lawful for
any person or persons whatsoever to erect, or cause to be erected, any
other bridge or bridges over or across the said river, constitutes a con-
tract on the part of the state, which cannot constitutionally be annulled
or abrogated.

It is immaterial whether the instrument by which the public faith is
pledged is in its terms a contract, or in form a mere legislative enact-
ment: in either event it is equally a contract within the meaning of the
constitution.

The Proprietors of the Bridges over the rivers Passaic and Hackensack
have, by contract with the state, the exclusive franchise of maintaining
said bridges, and taking tolls thereon, and such contract is within the
protection of the constitution, which declares that no law shall be passed
impairing the obligation of contracts.

But the construction of a viaduct over said river for a railway, to be used
exclusively for the passage of locomotives, engines, and railroad cars,
is not a *bridge* within the prohibition of said charter.

Public grants are to be construed strictly.

---

This case was argued upon bill and answer on motion
for an injunction.

*Zabriskie* and *Attorney General*, for complainants.

*Gilchrist* and *Bradley*, for defendants.

THE CHANCELLOR. By an act of the legislature, ap-
proved on the 8th of March, 1860, the Hoboken Land
and Improvement Company were authorized to lay out
and construct a railroad from Hoboken to Newark, with
power to erect and maintain the necessary viaducts over
the Hackensack and Passaic rivers. Claiming to act in
pursuance of the authority thus conferred, the defendants
have commenced the construction of a bridge, or viaduct,
*for* the purpose of carrying their railway across the Hack-

ensack. The Proprietors of the Bridges over the rivers Passaic and Hackensack, a company incorporated by the laws of this state, have filed their bill against the Hoboken Land and Improvement Company, praying that the defendants may be restrained by injunction from erecting the said bridge, or any other bridge, across the said river, between its mouth and the place where Kingsland creek empties into the same.

The complainants claim, under legislative grant, the exclusive right of maintaining a bridge across the Hackensack within the limits above specified. The defendants deny the existence of such exclusive right. They also deny, if the complainants have such right, that the bridge which they are constructing, and which is sought to be enjoined, is a violation of that right.

The material issues made by the bill and answer are—

I. Whether the complainants have, by virtue of a contract with the state, the exclusive franchise of maintaining a bridge across the Hackensack river, between its mouth and the place where Kingsland creek empties into the same, and of taking tolls thereon.

II. Whether the structure which the defendants are engaged in erecting is a violation of the complainants' franchise.

The exclusive right claimed by the complainants, though exercised for more than sixty years—though frequently the subject of legal investigation and legislative consideration—is now, for the first time, made the subject of direct judicial decision. Familiar, therefore, as the subject may be to the profession and to the public, it is proper that the grounds of the claim, and the numerous objections urged against its validity, should be considered, and, as far as may be by this court, settled.

The highway between Newark and New York, as is well known, is intersected by the Passaic and Hackensack rivers. The importance of the route, and the serious obstacles to its convenient use by the public, early

attracted the attention of the legislature. As early as the 20th of June, 1765, an act was passed for laying out a road from Newark to the public road leading from Bergen-point to Powles-hook, and for erecting and establishing ferries across the rivers Passaic and Hackensack. *Allinson's Laws* 276. Under the provisions of this act, the line of travel was opened and the ferries established.

On the 24th of November, 1790, the legislature, by an act entitled "An act for building bridges over the rivers Passaic and Hackensack, and for other purposes therein mentioned," appointed five commissioners, with special powers to carry into effect the purposes of the act. *Pamph. Laws* 685, *chap.* 333. The commissioners were authorized, in execution of the trust reposed in them, to select convenient and suitable sites, within certain prescribed limits, for the erection of bridges over the said rivers, and to erect, or cause to be erected at those sites, bridges of the description specified in the act. They were also authorized to lay out, in connection with the said bridges, a road four rods wide from the court-house in Newark to Powles-hook. The bridges so to be erected were declared to be toll bridges. The commissioners were authorized, "at their discretion, to let the said bridges to any person or persons, to be erected and made and kept in good repair by the tolls arising therefrom;" and the said commissioners, or the persons farming or having the care of said bridges, were authorized to demand and receive such rates of toll as the commissioners should appoint and direct to be paid.

In order the better to carry into execution the ends proposed by the act, the commissioners were further authorized, at their discretion, to contract and agree, with any person or persons who would undertake the same for such toll, and for so many years, and *upon such conditions*, as in their discretion should seem expedient.

It was further enacted, that the bridges to be built by virtue of the act should continue the property of the per-

sons therein mentioned, their executors, administrators, or assigns, for the term of ninety-nine years from the time of passing the act.

By the 15th section of the act (upon which the complainants' claim of an exclusive franchise is founded), it is enacted as follows: "It shall not be lawful for any person or persons whatsoever to erect, or cause to be erected, any other bridge or bridges over or across the said river Passaic, at any place or places between the mouth of the said Passaic river and the place where the brook, commonly called Second river (on which stand the mills of Cortlandt and Bennet), now empties itself into the said river Passaic; nor shall it be lawful for any person or persons whatsoever to erect, or cause to be erected, any other bridge or bridges over or across the said river Hackensack, at any place or places between the mouth of the said Hackensack river and the place where Kingsland creek empties and discharges its waters into the said river Hackensack."

The act contains various other provisions relating to the rights, duties, and property of the grantees of the franchise.

On the 19th of February, 1793, the commissioners, in pursuance of the powers conferred by the act of 1790, entered into a contract in the form of a lease by deed, indented, made, and executed by and between the commissioners, of the one part, and Samuel Ogden and thirty-six others, his associates, of the second part, for building and maintaining the said bridges. By the contract, the commissioners demised, granted, and to farm let, to the party of the second part, the bridges to be erected over the rivers Passaic and Hackensack, with the right of taking tolls thereon, not exceeding certain specified rates, for the term of ninety-seven years from and after the 24th of November, 1792, being the entire term for which the property and franchise was vested in the commissioners by the statute. In consideration of this grant, the lessees

covenanted to construct the bridges within the time limited by the act, at the points and in the manner designated by the commissioners to perform the duties enjoined by the act, and, at the expiration of the term, to surrender the bridges and causeways in good repair unto such persons as may be by law authorized to receive the same. On the 5th of November, 1798, the legislature, on the petition of the stockholders, extended the time for the completion of the bridge six months beyond the time originally limited.

By an act of the legislature, passed on the 7th of March, 1797, (*Pamph. Laws* 200) the stockholders of the bridges, under the lease thus made by the commissioners, were incorporated under the name of "the Proprietors of the Bridges over the rivers Passaic and Hackensack."

This brief historical statement presents the origin of the complainants' title to the exclusive franchise claimed by them, of maintaining bridges across the rivers Passaic and Hackensack, and seemed necessary to a full understanding of the nature and foundation of their claim, and of the force of the objection urged against it.

The complainants claim that the 15th section of the act of 1790, by which it is declared that it shall not be lawful for any person or persons whatsoever to erect, or cause to be erected, any other bridge or bridges over or across the said river, &c., is a contract on the part of the state which cannot constitutionally be annulled or abrogated.

To this claim it is objected (1st) that nothing in this act can operate as a contract on the part of the state, inasmuch as there was no party with whom the contract could be made. The act is not a charter of incorporation—it confers no corporate powers. The commissioners named in it are agents of the state exercising a public trust. They were to receive no personal benefit from the act, save a mere compensation for their services. They were to account for the moneys received by them, in like manner as the trustees under the act of 1765, for erecting

and establishing ferries across the rivers Passaic and Hackensack.

All this is true. The commissioners named in the act did exercise a public trust. They were the agents of the state; they were authorized to receive money by gift and to raise money by lottery, for the purpose of erecting the bridges proposed to be built; but they were also, by the act, invested with the property of the bridges to be built for the term of ninety-nine years and with the franchise of taking tolls. They were authorized to farm out the building of the bridges and the franchise of taking tolls to others who would undertake the work; the rights and privileges of the parties to whom the building and care of the bridges should be farmed out was specified in the act, and the faith of the state was pledged that no other bridge should be erected to the prejudice of the franchise thus granted during the continuance of the grant. The contract thus made by the commissioners, in pursuance of the act, was declared to be valid and binding on the parties contracting as well as on the state of New Jersey, and as effectual as if the same had been particularly and expressly set forth and enacted in the law. It is immaterial whether the instrument by which the public faith is pledged is in its terms a contract, or in form a mere legislative enactment. In either event, it is equally a contract within the meaning of the constitution, and cannot be annulled or violated at the pleasure of the legislature.

It cannot be doubted that the enactment was intended by the legislature as an inducement to capitalists to embark in the enterprise in the hope of eventual remuneration, inspired by the pledge of protection against competition, and that it was so understood and accepted by those who engaged in the undertaking. The pledge must have been intended for the benefit of the parties who might contract with the commissioners to erect and maintain the bridges. It could otherwise have no practical operation whatever.

That this provision was regarded by the legislature themselves as a contract for the benefit of the parties who should erect the bridge, is apparent from the proviso of the 15th section, by which it is provided, that if the commissioners, or some person under them, should neglect for the space of four years to erect the bridges in pursuance of the act, or when erected to maintain and support them, or either of them, it shall be lawful for the legislature to repeal or alter the act. Nothing can be more explicit. A violation of the undertaking, on the part of the commissioners or their lessees, shall absolve the legislature from all obligation to observe the engagement upon their part.

Again, it is objected that the language of the act imposes no obligation or restriction whatever upon the legislature. It does not declare that the legislature will not authorize another bridge to be erected: it simply declares that it shall not be lawful for any other person to erect another bridge—which is a mere legislative prohibition, acting not upon the legislature but upon the citizen, and which may be repealed by any subsequent legislature. But the obvious answer to this objection is, that upon this construction the act is entirely nugatory and without meaning. The rivers Passaic and Hackensack were then, as they now are, navigable rivers. No bridge could be erected over either of them, except by legislative authority. The act of 1790 conferred authority upon the commissioners and their grantees to build the bridges; and the 15th section was intended as an engagement, upon the part of the legislature, that the authority should be conferred upon no other. The plain meaning of the clause is, that it shall not be *made* lawful for any other person to erect a bridge over either river. The language used, though perhaps somewhat equivocal, is the usual form in which the public faith is pledged. It is in fact the ordinary legislative formula in which exclusive privileges are granted. Instances of a precisely similar character will be found in the supplement to the charter of the Trenton

Delaware Bridge Company, in 1801, *Pamph. Laws* 58; in the supplement to the charter of the Delaware and Raritan Canal Company, in 1830, *Harr. Comp.* 330; and in an act relating to the Camden and Amboy Railroad Company, in 1831, *Harr. Comp.* 331.

Again, it is objected that the complainants can have no vested rights, except those enumerated or specified in the lease of the commissioners to the farmers of the work, on the 19th of March, 1793, and that this exclusive privilege is not granted or specified in the lease. But the grant of the exclusive right emanated not from the commissioners, but from the legislature. It was conferred, as we have seen by the terms of the act, not only upon the commissioners, but upon those by whom the bridges should be erected. This right, in common with others, is conferred by the act. Duties and burthens are imposed by the act. It required no contract of the commissioners to confer the right or impose the duty. The commissioners might at their discretion, under the authority conferred by the act, have restricted the privileges of their grantees; but in the absence of such limitation, they are entitled to all the privileges and benefits conferred by the act as fully as they were vested in the commissioners.

This was the unanimous opinion of the Supreme Court in the case of *The Bridge Proprietors* ads. *The State*, 1 *Zab.* 384, confirmed by the Court of Errors in the same case, 2 *Zab.* 593.

It is further objected, that if the exclusive right ever vested in the lessees of the commissioners, it was forfeited prior to the act of incorporation by a failure to complete the bridge within the time limited by the proviso annexed to the 15th section. By that proviso, if the bridge was not completed within four years from the passage of the act, it was declared that it should be lawful for the legislature to repeal or alter the act.

By the act of 5th November, 1794, the time for the completion of the bridge was extended six months. It is

urged that this act extending the time did not relieve the company from the forfeiture incurred by failing to complete the bridge within the period originally limited. The obvious answer to this objection is, that it does not appear that the bridge was not completed within the time originally specified. The act for the extension of the time was passed within four years from the date of the original act, and the preamble states that it was represented that the bridges were nearly completed, but that apprehensions were entertained that they might not be entirely finished before the term allowed by law for the purpose would expire. But there is no evidence whether, in point of fact, they were or were not finished within the time originally limited. But if the fact were proved, as alleged, there is nothing in the objection. The act extending the time, being passed before any forfeiture by nonperformance was incurred, clearly relieved against all consequences of nonperformance. There was, in fact, no failure to perform the contract. The extension of the time for performance by the act of 1794 operated precisely as if the time thus extended had been limited in the original act.

Lastly, it is urged that the complainants' right, if it ever vested in them, has been forfeited by their consent to the construction of other bridges across the river. There is nothing whatever in the objection. The right remains, except so far as it has been parted with by the complainants. There is no conceivable reason why a corporation, having the exclusive right of way across a river, should forfeit the right by consenting that one bridge should be constructed, any more than that the owner of land should forfeit his right to the soil, because he permits another to have a right of way across it. His right remains perfect, except so far as he has voluntarily consented to part with it.

I entertain no doubt that all the rights and privileges

H*

conferred by the act of 1790 passed under the contract of the commissioners to their lessees—not by the terms of the contract, but by force and operation of the act itself; that they continued in the company under their act of incorporation; and that they are now, for aught that appears in this case, in the complainants, as fully and effectually as they were originally conferred by the act, except so far as they have been parted with by the voluntary act of the corporation.

I am of opinion, therefore, that the proprietors of the bridges over the rivers Passaic and Hackensack have, by contract with the state, the exclusive franchise of maintaining said bridges, and taking tolls thereon, and that such contract is within the protection of that provision of the constitution which declares that no law shall be passed impairing the obligation of contracts.

The remaining inquiry is, whether the structure which the defendants are erecting is a violation of the complainants' right.

The act of 1860, under which the defendants are acting, authorized them to lay out, and construct and operate, a railroad from Hoboken to Newark, with power to erect and maintain the necessary viaducts over the Hackensack and Passaic rivers. The defendants, by their answer, allege that the bridge which they are erecting is solely for the purpose of completing their railroad, as authorized by the act. That it will be so constructed that no foot passenger or animal, nor any vehicle or carriage of any kind known or in use in the year 1790 (the date of the complainants' grant) can safely cross it; that the bridge is being constructed, and is intended to be used exclusively as a viaduct for their railway, for the passage of locomotives, engines, and railroad cars over the river, in their transit between Newark and Hoboken; and that the engines and cars cannot cross the river upon the bridge of the complainants, nor upon any bridge known or used in 1790.

In terms, the grant of the complainants' franchise pro-hibits the building of any bridge whatever across the river. But every bridge built within the prohibited limits is not necessarily a violation of the grant. The com-plainants have not a monopoly of building bridges. They have the right of building one bridge, and the right of taking tolls thereon. The prohibition of other bridges was designed to prevent competition, and to give to the complainants the exclusive franchise of taking tolls within the limits specified. It is the exclusive right of taking tolls, not of having a bridge, that constitutes the value of the franchise. Whether, therefore, a bridge erected across the river is an infraction of the plaintiffs' franchise, must depend upon the purpose to which it is to be applied. The structure itself does not detract from the value of the franchise. The construction of an aqueduct for the pas-sage of a canal or of water-pipes across the river, though a *bridge* and within the terms of the prohibition, would be no violation of the grant. Such structure clearly was not within the contemplation of the contracting parties.

To determine the true construction of the contract, re-course must be had to the subject of the contract and to the intent and particular objects of the grant.

The legislature, by the act of 1790, were making pro-vision for increasing the facilities of communication be-tween Newark and Powles-hook by the ordinary methods of travel upon the public highway. Provision was made for opening a new road, and substituting bridges for ferries upon the route. To the persons undertaking the work, a grant was made of the franchise of building and having the bridges, and of taking tolls thereon. The character of the bridges to be built was adapted to the modes of travel then known and used. The franchise of taking tolls was limited to the same objects. The lessees are authorized to take tolls for foot passengers, persons on horseback, wheel carriages and sleighs drawn by horses and oxen, and for domestic animals. Since the grant of

the complainants' franchise, a new motive power has been introduced, with new appliances for transportation by engines and cars, requiring a new description of track totally dissimilar in character from the ordinary highways in use in 1790. The accommodation of this new character of road and means of transportation could not have been within the contemplation of the legislature in the grant of the franchise. The complainants have no franchise of taking tolls for locomotives or cars. The franchise cannot, by implication or construction, be extended to include them. The grant in this particular, as in all others, must be construed strictly. *The Proprietors of the Stourbridge Canal* v. *Wheely*, 2 *Barn. & Ad.* 792.

Again, the character and description of the bridges to be built by the complainants are adapted only to the modes of travel then known and used upon the ordinary highways. Nor have the complainants any right to adapt their bridges to the accommodation of railroad travel. By the terms of the lease, the bridges specified in the act and agreement are to be kept in repair, and are to be delivered up at the expiration the lease. The proprietors have no authority to convert the causeway and bridges to the purposes of a railway. The two methods of travel upon the same bridge are incompatible with public safety and detrimental to the public interests. If converted to the purposes of a railway, the bridge must be abandoned or remain comparatively useless for the purposes of ordinary travel, thus defeating the very object for which the bridge was erected and the franchise granted, *viz.* the accommodation of travel upon ordinary highways. To guard against this evil, the legislature, when conferring power upon the New Jersey Railroad Company to purchase the capital stock of the turnpike roads and bridges on the route of their road, coupled with it a proviso, that the Newark turnpike, and the bridges over the rivers Hackensack, Passaic, and Raritan, should be preserved without obstruction as public roads, as heretofore. The

complainants are thus prevented from maintaining a bridge for the accommodation of railway travel. They have neither the franchise of having a railroad bridge nor of taking tolls from railway passengers.

The design of the act, moreover, was to accommodate the entire travelling public. The bridges are declared to be a public highway, free for all citizens to pass over on paying the accustomed toll. But the bridges are free only to those travelling by usual and known methods upon the public highway. They are not free to the great mass of the travelling public. The great torrent of railroad travel must seek another channel. The complainants are neither required nor allowed to accommodate it. Aside from the restrictions which have been imposed upon them by the terms of their contract and by legislative enactment, they never could have supposed that they were required to furnish facilities for a railway, or for locomotives and trains of cars, to cross the bridges. It was not within the scope of their contract. If the bridge proprietors were not bound to accommodate the railway traffic, were the legislature restrained by the terms of the grant from providing facilities for railroad travel? The bridge company were required to accommodate all travel upon the public highway. From these travellers they had the exclusive franchise of taking toll. The legislature engaged that no other bridge to accommodate that character of travel should be built, and that the whole of it should enure to the benefit of the complainants. But they did not oblige themselves to compel travellers to adopt that mode of travelling, nor deprive themselves of the right of sanctioning better and more expeditious methods. Applying to this contract the ordinary rules of interpretation; having regard to the subject matter of the contract itself; considering that it related solely to the travel upon ordinary highways by methods then known and used, and that the complainants' franchise extended only to such travel, the construction of a rail-

road bridge for the sole accommodation of railroad travel cannot be deemed an infringement of the complainants' rights.

Again, the complainants' franchise consists in the right of taking toll for crossing the river. But the defendants' structure is not a toll bridge. They have no franchise of taking tolls. They have no right to charge for crossing the river, any more than if it were not in existence. The structure which they are erecting is not a mere connection between the opposite shores—it is part of an extended line of railway, connecting distant points, over which the defendants are to transport passengers at a stipulated rate. Nor is it a *free* bridge, by which parties may evade paying toll upon the complainants' bridge to the prejudice of their franchise. Its character and purpose are in fact essentially different from that of a bridge used merely as a connecting link for the transfer of passengers between the opposite shores of a river.

Public grants are to be strictly construed. Contrary to the rule adopted in the case of private contracts, they are to be taken most strongly against the grantee and in favor of the public. If there be a doubt as to the extent of the grant, the doubt is resolved in favor of the public. This is especially true of all grants which, like the present, narrow the powers or abridge the functions of government. This grant is in derogation of public right. It restrains the sovereign power. It narrows the exercise of the great duty, which the sovereign owes the people, of furnishing convenient highways.

In the case of *The Mohawk Bridge Co.* v. *The Utica and Schenectady Railroad Co.* (6 *Paige* 564) the bridge company claimed the exclusive right to convey passengers across the river—the right extending one mile above and below the bridge. The act, in terms, restrained only the erection of ferries within those limits, but the complainants claimed that the prohibition extended to bridges or to any mode of transporting freight and passengers across

the river. It was held that the prohibition of erecting ferries did not prevent the erection of a bridge. " Much less (says the Chancellor) is the legislature deprived of the power to provide for the conveyance of freight or passengers from one part of the state to another, by an improvement which was entirely unknown at the time when the grant to the bridge company was made. And if that grant had, in terms, given to the corporation the exclusive right of erecting a toll bridge across the river at Schenectady, this subsequent grant to the railroad company to cross the river with their railway from Schenectady to Utica, and to transport passengers thereon, in the ordinary course of their business in the conveyance of travellers from one place to another, would not have been an infringement of the privileges conferred by such prior grant, as the railroad bridge could not be a toll bridge within the intent and meaning of the grant to the first company. Grants of exclusive privileges being in derogation of public rights belonging to the state, or to its citizens generally, they must be construed strictly, and with reference to the intent and particular objects of the grant." This case is cited with approbation by the court in *Thompson* v. *The N. Y. and Harlem Railroad Co., 3 Sandf. Ch. R.* 657.

In *McRee* v. *The Wilmington and Raleigh Railroad Co., 2 Jones' Law R.* 186, it was held by the Supreme Court of North Carolina, that the franchise of having a bridge and taking tolls was not violated by extending a railroad across the river. The case, in many of its essential features, was like the present. The legislature of North Carolina, in the year 1766, had granted to an individual and his assigns the franchise of building a bridge across the Northeast branch of Cape Fear river, and the bridge, when built, was declared to be vested in the grantee, his heirs and assigns for ever. The act provides that when the bridge was built, it should not be lawful for any person whatever to keep any ferry, *build any bridge,* or set

any person or persons, carriage or carriages, cattle, hogs, or sheep, over said river for fee or reward, under the penalty of twenty shillings. The court decided that notwithstanding the grant of the franchise of taking tolls, and notwithstanding the provision of the act, that it should not be lawful to build any other bridge across the river, the legislature had the power to grant the defendants a right to construct a railroad across the river, and to consider the transit over the river as a part of the road.

It is material to observe that the structure of the defendants is not designed as an evasion of, or fraud upon the rights of the complainants. It is not an attempt to carry passengers across the river, either free or for toll, in evasion of the complainants' franchise. The avowed purpose of the defendants is to construct and complete a continuous line of road from Newark to Hoboken, and to transport passengers over the entire route. The diversion of travel from the complainants' bridge, and the consequent loss of tolls, is an incidental consequence of opening a new route of travel, of which the complainants have no legal right to complain.

But the complainants do not rely upon the act of seventeen hundred and ninety alone to support their claim. It is charged, in their bill of complaint, that the New Jersey Railroad Company purchased, at a great advance over the par value, and now hold over nine hundred and fifty shares of the one thousand shares that constitute the capital stock of the bridge company; that in the contract giving to the railroad company permission to erect their bridge across the Hackensack and Passaic, large advantages were secured to the other stockholders of the bridge company; that the railroad company made such purchase and contract on the faith of the contract made by the state with the bridge company, believing that the contract of the state would be observed, and could not be violated, and that no other bridge could be erected within said limits so as to interfere with the business and income of

the bridge company or with the business and income of the railroad company without the consent of the complainants, unless upon full compensation to them and to the railroad company for the damage and loss which each of them might sustain by the erection of a new bridge.

This charge doubtless discloses the *gravamen* of the complainants' bill. The injury which they apprehend is not so much the loss of tolls by the bridge company as the diversion of travel and traffic from the railroad. The complaint is virtually that of the railroad company, who insist that, by the purchase of the franchise granted by the legislature to the bridge company of taking tolls for crossing the river by travellers upon the ordinary highway, they have secured the monopoly of the right of way for a railroad across the rivers. Can such claim be well founded? Could such result have been within the contemplation of the legislature? Was it within the design or purpose of the grant? And if the claim be sustained, will it not be extorting from the legislature, under color of a grant for a totally different purpose, exclusive privileges which never would have been conferred by direct legislation? It is charged, in the complainants' bill, that the contract with the bridge company was authorized by the legislature for the express purpose of giving to the railroad company the control of the right of way. If such was the design of the legislature, it would have been easy and natural to make the grant in express terms. A totally different design is patent upon the face of the act. The bridge company, doubtless then as now, claimed that the construction of a railroad across the river would be an infringement of their franchise. The legislature naturally regarded it as just and equitable that compensation should be made for any loss they might sustain by the grant of the railroad charter. Doubts existed as to the extent of the complainants' franchise, and the railroad company may have naturally believed that it would be for their interest to purchase it. They may have hoped thus to

receive the advantage which they now claim; but that such result was within the contemplation of the legislature is not apparent upon the act, and cannot be inferred from it. If the railroad company believed, as it is charged in the bill, that by the grant they acquired the control of the right of way for railroads, they suffer the consequences of their own mistake; but their belief cannot tend to enlarge the franchise or change the character of the grant.

The complainants also insist that their rights have been repeatedly recognised by the legislature, and that, by the act of 1860, it is expressly provided that compensation shall be made for their franchises, and that the defendants are prohibited from constructing their bridges until such compensation is first made or tendered.

The legislature have, on frequent occasions, manifested a laudable regard for the public faith by sedulously guarding the chartered rights of the complainants. To this end there have been inserted in various legislative grants express provisions, that nothing therein contained should be construed, in any manner, to impair their rights or privileges or other clauses designed to preserve their rights inviolate. But these and similar provisions are designed simply to protect existing rights, not to create or enlarge them. The character and extent of the rights are to be sought for in the grant itself and in express legislative recognition of its limits. Such recognition, it is believed, will be no where found, except it be in the act of 1860, which confers upon the defendants power to construct their road. The legislature had an undoubted right, in conferring that power, to impose upon the defendants such terms as they saw fit. The grant of power is exceedingly broad; and if, in making it, the legislature deemed it just and equitable to require that the defendants should compensate the complainants, not only for the value of their franchises, but also for all loss or damage which they or their grantees, the New Jersey Railroad and Transportation Company, might

sustain by the construction of a new road, and the conse-
quent diversion of travel, the requisition is binding, and
the complainants are entitled to the aid of this court to
enforce a compliance with its terms.

A casual reading of the law seems to justify the in-
ference that the legislature intended that the Hoboken
Land and Improvement Company, as a compensation
for the rights and property of the bridge company and
of the New Jersey Railroad Company, which they were
authorized to appropriate, should pay not only for all
the rights and franchises *owned*, but for all *claimed* by
them. But no such inference can be legitimately made
in the absence of an express grant. Upon the most
careful consideration of the law, I find no such pro-
vision. The legislature have, by the terms of the act,
manifested a clear intention to confer all necessary
power to construct the road, and that no property, right,
or franchise of the complainants or of the railroad com-
pany should stand in the way of its completion. On the
other hand, there is an equally clear intention that the
defendants should make compensation for all property,
rights, and franchises so taken and appropriated.

The provisos of the 1st and 8th sections of the act re-
serve to the complainants their right of compensation
under the 5th and 6th sections. The 8th section author-
izes the defendants to run their engines and cars upon
any bridge of any corporation, and the application of the
proviso to that section is sufficiently obvious. The pro-
viso of the 1st section authorizes the defendants, in case
they are enjoined or prevented by legal proceedings from
constructing and using their own bridges, to use the
bridges and track of the New Jersey Railroad Company,
" reserving, *notwithstanding such consent*," to the complain-
ants their right of compensation under the 5th and 6th
sections. No *consent* had previously been mentioned.
The provision, as it stands, is unintelligible. The de-
fendants, by their answer, explain the incongruity by

stating that the section, as it originally stood, required the consent of the railroad company to the use of their road; and the last clause was inserted to guard against *such consent* by the railroad company operating to the prejudice of the bridge company; but that the clause requiring the consent of the railroad company being stricken out, the clause protecting the rights of the bridge company was inadvertently and inappropriately retained. This explanation in no way affects the inference which the complainants draw from the language of the section. They insist that, by this section, compensation is reserved to the complainants in case the defendants use the track of the New Jersey Railroad Company for the passage of their cars; and that the complainants can be entitled to no such compensation, unless the use of the railroad track, and the transportation of passengers thereon, was regarded by the legislature as a violation of their franchise, for which they intended to provide compensation.

But it must be borne in mind that the act reserves to the bridge company only their right of compensation under the 5th and 6th sections of the act; and it is too clear to admit of question that those sections provide compensation only for rights *owned*, not for rights *claimed*. They do, indeed, provide a way in which persons, either owning or claiming rights, may have those rights adjudicated. But the commissioners appointed to make the valuation are to report " what (if any exist) and how much, and what part of any rights, privileges, franchises, and property are necessary to be taken and appropriated, exercised, or used for the purposes of the act, and to make a just and equitable assessment or appraisement of the value of (if any such exist) the said rights, privileges, franchises, and property, or so much thereof as may be necessary."

The plain language of the act, as well as the manifest reason and justice of the thing, requires that the defend-

ants should make compensation, not for franchises claimed, but for franchises owned—not for imaginary, but for existing rights.

I find nothing in the act to sustain the claim of the complainants. The defendants have not entered upon their land nor taken their bridges. They have taken no right, privilege, or franchise of the complainants for which they were required to make or tender compensation.

I am of opinion, therefore, that the motion for an injunction must be denied, and the complainants' bill dismissed with costs.